Filed 2/6/25  In re Penelope C. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# COURT OF APPEAL, FOURTH APPELLATE DISTRICT

# DIVISION ONE

# STATE OF CALIFORNIA

| | |
|---|---|
| In re PENELOPE C., a Person Coming Under the Juvenile Court Law. | D084630 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>BRIAN M. et al.,<br><br>        Defendants and Appellants. | (Super. Ct. No. NJ15853) |

APPEAL from an order of the Superior Court of San Diego County, Nadia J. Keilani, Judge.  Affirmed.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant Brian M.

Mansi Thakkar for Defendant and Appellant Lindsey C.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, Kristen M. Ojeil, Deputy County Counsel, for Plaintiff and Respondent.

To establish the parental-benefit exception to adoption, among other requirements a parent must show "regular visitation and contact" with the dependent child. (Welf. & Inst. Code,[1] § 366.26, subd. (c)(1)(B)(i); accord *In re Caden C.* (2021) 11 Cal.5th 614, 632 (*Caden C.*)). In this case, Brian M. (Father) was absent for most of the dependency of daughter Penelope C. (Minor). In assessing Father's contacts for purposes of this exception, the juvenile court applied what effectively is a "knew or should have known" legal standard in finding Father did not maintain consistent contact with Minor during the proceedings. It therefore refused to apply the parental-benefit exception to Father and terminated his parental rights.

Father, joined by Lindsey C. (Mother),[2] argues the evidence does not support the juvenile court's finding he failed to maintain regular visitation and contact with Minor. He further argues he proffered sufficient evidence to support the additional requirements of the parental-benefit exception—that a

---

[1]    All further statutory references are to the Welfare and Institutions Code.

[2]    Mother joins in Father's argument and asserts that reversal of the order terminating his parental rights requires that order also be reversed as to her. (See Cal. Rules of Court, rule 5.725(a)(1) ["The court may not terminate the rights of only one parent under section 366.26 unless that parent is the only surviving parent; or unless the rights of the other parent have been terminated by a California court of competent jurisdiction or by a court of competent jurisdiction of another state under the statutes of that state; or unless the other parent has relinquished custody of the child to the welfare department."].)

beneficial relationship existed between him and Minor and the child would suffer detriment from the loss of that relationship. Alternatively, he seeks remand for the court to determine whether he satisfied these requirements.

As we explain, we conclude the juvenile court properly evaluated Father's contacts with Minor by applying the "knew or should have known" standard, as there is strong evidentiary support—including the inferences to be drawn from such evidence—that during the dependency Father knew, or should have known, of the proceedings and simply chose not to participate. Because the record does not compel a finding that he maintained regular visitation and contact with Minor during dependency, we affirm the court's order terminating parental rights.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

### A. *Prelude to Dependency*

Respondent San Diego County Health and Human Services Agency (Agency) received a referral on September 12, 2021, one day after Minor was born, due to Mother's positive test for amphetamines. Mother refused to provide the Agency with any demographic information about Minor's father. She explained, however, that Father had dropped her off at the hospital after initially refusing to drive her. He then went to work.

Minor remained hospitalized until late October 2021, when the hospital discharged her to Mother's care. The child is "medically fragile," nonverbal, and receives most of her meals through a feeding tube.

At the time of discharge, Mother was residing with Father in a downstairs apartment below the home of maternal grandparents. A few

---

[3] Because Mother has raised no independent issues, we omit facts and issues pertaining only to her.

months later, Father moved out, although he continued to stop by "often" to assist Mother.

## B. *Dependency*

Mother next came to the attention of the Agency in late May 2022, after law enforcement received a call about a reckless driver.  Officers contacted Mother and observed Minor, then about eight-months old, unrestrained in the back seat of the car.  Mother failed a field sobriety test and officers found methamphetamine in her purse.  During an Agency interview a few days later, Mother stated she had taken Minor to visit the child's "father" because Mother did not want Minor "to wonder who he is when she is older."  Roughly one month later, the Agency filed a petition under section 300, subdivision (b)(1)(D) (Petition) alleging Minor has suffered, or there was a substantial risk she would suffer, serious physical harm or illness due to Mother's substance abuse.

The Agency's July 2022 Detention Report listed Father as Minor's presumed father and included his address and telephone number.  On three different days in early June, the Agency called and left voicemails for Father.  On June 14, it sent an "unable to locate letter" to his address.  Mother continued to give conflicting statements to the Agency about Minor's father.  In early July 2022, the juvenile court detained Minor in a confidential resource family approved home, where Minor has remained throughout dependency.

The Agency continued its efforts to contact Father.  In July 2022, it called a number beginning with the area code 760 that went straight to voicemail.  The Agency left a message, requesting Father return its call.  It also called another number beginning with a 442 area code.  No voicemail

4

was set up for that number and after several rings the call terminated.  The Agency also sent Father a text message.

During another Agency interview, Mother initially claimed she did not know who the father of Minor was, then stated he "was a bad person and she did not want him involved" in Minor's life.  She also refused to give any information about the father when questioned by the juvenile court.  In August 2022, the court made a true finding on the Petition and entered jurisdictional and dispositional orders removing Minor from Mother's care.

At the six-month review hearing in March 2023, Mother for the first time identified Father as Minor's biological parent.  Mother did so only after the juvenile court had issued a bench warrant when she failed to appear at an earlier hearing when the court intended to inquire about paternal parentage.  During the March hearing, Mother's counsel informed the court that Father allegedly had committed domestic violence against Mother and "had made himself very clear that he did not want to be part of these proceedings and had requested that the mother take his name off the petition or else he would retaliate."  The court thereafter extended Mother's reunification services to the 12-month date.

After Mother's disclosure, the Agency again made several unsuccessful attempts to contact Father.  As part of its ongoing efforts, the Agency located paternal grandmother.  She informed the Agency she had not heard from Father for more than four years.

1. *Father Appears in the Dependency*

Father first appeared in the dependency proceedings on August 8, 2023, at the 12-month review hearing.  He agreed to take a paternity test, which subsequently confirmed he was Minor's biological father.

5

During the hearing, the juvenile court questioned Father about how and when he learned of the dependency. Father stated Mother had called him the night before and explained it was possible Minor could be "adopted out." Father added, "And I was, like 'What? Hold on. What's going on with this case?' I had no idea this was here this far. No. No way." Father explained he "[s]ort of" knew about the dependency proceedings, adding, "I know that there was visitation, but I'm not sure – like, I didn't know it was like this. I thought everything was being taken care of and [Mother] was doing everything that she needed to be doing to be getting our daughter back." Father claimed to have lived at the same home in San Marcos for more than five years.

At the continued 12-month review hearing, the juvenile court ordered Father to have liberal supervised visitation with Minor and the Agency to provide him with voluntary services. The court set Father's section 388 petition to vacate the jurisdiction/disposition orders for alleged lack of notice, and his request for presumed father status, for evidentiary hearing to coincide with the contested 12-month review hearing.

2. *Father's October 2023 Interview*

Between August and October, Father had no contacts with the Agency. Father explained he could not call the Agency because he used an " 'Obama phone' " and the phone no longer worked, which "required him to obtain a new phone and be assigned a new phone number." Father denied any prior involvement with the Agency.[4]

---

[4] Agency records, however, showed there was an "open investigation" involving Father's two younger children from another relationship, and there had been a past investigation regarding his two older children also from a different relationship. Agency social workers investigating these other cases also reported that Father did not return their calls. In fact, the Agency's

Father claimed he first learned of the Agency's involvement with Minor in April or May 2023, and in July learned of the upcoming August hearing. Father told the Agency he had no explanation for why he did not come forward and contact the Agency sooner. He acknowledged he has remained in contact with Mother, and sometimes transported Mother to visit with Minor, adding, " 'She is the mother of my child, I will help her out if she asks.' " At the time of the Agency's October 24 report, Father had just begun having supervised visits with Minor one day a week for an hour.

3. *The Contested Section 388 Hearing*

At the December 5, 2023 hearing, Father testified he had mistakenly believed that maternal grandmother had "custody" of Minor from March 2022 to early August 2023, and that the child lived with maternal grandparents while Mother lived in the downstairs apartment. He claimed neither the maternal grandmother nor Mother told him about Minor's dependency, and that he first became aware Minor had been removed from Mother's care when she called him the night before the August 8 hearing and told him their daughter could be adopted.

Regarding visitation, Father and Mother had an informal "coparenting arrangement" in which *she* would make Minor available when he wanted to "see" the child. As a result, Father "didn't feel [he] needed to come to family court and get anything." Father estimated he had unsupervised visits with Minor about five or six times between July 2022 and August 2023. According to Father, one such visit occurred in about April 2023, when Mother was having only supervised visitation.

---

involvement with Father predated Minor's birth. In February 2020, Mother and Father were arrested for child cruelty and endangerment after law enforcement found methamphetamine and heroin within the reach of Father's youngest child.

7

After the August 2023 hearing, Father agreed to start treatment for substance abuse despite his assertion that he was then sober. Father claimed he would do "anything" for Minor, even though he "didn't create this situation."

In denying Father's section 388 petition, the juvenile court found that the Agency exercised reasonable diligence in attempting to locate him.[5] The court expressed "real concerns" about Father's credibility, including how and when he learned of the dependency. It observed that while Mother was pregnant with Minor, he allegedly committed multiple acts of domestic violence against her, as she stated under penalty of perjury in a court filing. It further noted that on the day Mother gave birth, Father just "dropped [her] off [at the hospital] and continued on with his day." Finally, it found that his claim of being involved in Minor's life was belied by the fact that he allegedly did not realize "for over a year" "that his daughter was the subject of a dependency proceeding; that she had, in fact, been removed from the mother; that she was not living with the grandmother; [and] that she was living in the home of someone entirely different."

---

[5] Father has not challenged this order on appeal. The issue is therefore forfeited. (See *In re P.L.* (2024) 100 Cal.App.5th 406, 409, fn. 4 (*P.L.*) [father forfeited his challenge to juvenile court order when "his opening brief contain[ed] no argument challenging" it]; *In re Daniel M.* (2003) 110 Cal.App.4th 703, 707, fn. 4 (*Daniel M.*) [in an appeal from an order terminating parental rights, failure to raise an issue in an appellate brief forfeits the issue].)

At the same hearing, the juvenile court denied Father presumed father status,[6] terminated Mother's reunification services, and set the section 366.26 hearing for April 2024.[7] By this time, Father had progressed to two visits per week with Minor.

C. *Selection and Implementation*

The Agency's April 3, 2024 Selection and Implementation Report recommended termination of parental rights and adoption as the permanent plan for Minor. It found Minor to be generally and specifically adoptable, as her current caregivers expressed a willingness to provide her with a loving, safe, and stable home through adoption.

In recommending termination of Father's parental rights, the Agency noted Father had been voluntarily absent for most of Minor's dependency, as he reported being in contact with Mother "throughout the case" but denied being aware of the proceedings. In addition, he waited until the 12-month review hearing to make his first appearance,[8] and did not respond to the

---

[6] A biological father is one whose paternity has been established, but has not shown he qualifies as the child's presumed father. (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1209.) The court may, in its discretion, order reunification services for biological fathers if it determines services would benefit the child, but is not required to do so. (§ 361.5, subd. (a).) In contrast, presumed father status confers the highest degree of procedural protection. (*T.R.*, at p. 1209.) For elevation to presumed status, a father must establish one or more statutory criteria that show he has taken an active familial role in the child's life. (*Ibid.*)

[7] Father filed a Notice of Intent to File Writ Petition, challenging the juvenile court's orders. We dismissed his petition after appellate counsel indicated there were no "viable issues for writ review."

[8] See section 361.5, subdivision (a)(1)(B) [when a child younger than three is removed from parental custody, reunification services are generally

Agency despite its myriad attempts to contact him both before and after August 2023. The Agency also determined that Minor did not have a substantial, positive, emotional attachment to Father, and would not suffer detriment if the court terminated the parental-child relationship.

In April 2024, Father filed another section 388 petition seeking placement of Minor with him. The juvenile court set the matter to coincide with the contested section 366.26 hearing. Minor was then about to turn three years old and had been in dependency for about 75 percent of her lifetime.

### D. *Section 388 Petition and Contested Section 366.26 Hearing*

Numerous witnesses testified in the multi-day evidentiary hearing, which concluded on August 9, 2024. In contravention of a court order, Father failed to appear for the evidentiary hearing. He also did not respond to the juvenile court's "repeated" attempts to contact him that day or to his own counsel.

As relevant here, Mother testified that in the beginning of dependency she had not been "dishonest" with the juvenile court and the Agency when she claimed to not know who Minor's father was. She communicated with Father "[a] couple times" about her DUI arrest. Eventually, she told him about the dependency and how Minor had been removed from her custody and placed into foster care.

One of Minor's caregivers, Trisha B., also testified at the hearing. The child had been in their care for more than two years. Her medical needs involved numerous appointments and "various therapies" that happened "all day long every day" in and out of the home. Trisha and her husband wanted

---

offered to the parents or presumed parents for a maximum of 12 months from removal].

10

to adopt Minor, as they "love and adore her" and only want the best for her, which included having a positive relationship with her biological family.[9]

The juvenile court denied Father's section 388 petition, finding by clear and convincing evidence that placing Minor in his care would be "detrimental to her safety, protection, and physical and emotional wellbeing."[10] In terminating Father's parental rights, the court also found he did not have regular visitation and contact with Minor when he knew, or should have known, about the dependency but chose not to participate in those proceedings.[11]

## DISCUSSION

### A. *Parental-benefit Exception*

" 'At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship or long-term foster care. [Citation.] If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans.' [Citation.]" (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1224.) Once the juvenile court finds the child is

---

[9] Other witnesses who testified included Dr. Elizabeth Stanton, a clinical psychologist, who addressed Father's relationship with Minor; and Agency social workers Naomi Basile and her supervisor, Cheryland Trice, who recommended termination of parental rights and adoption as the permanent plan for Minor.

[10] Father on appeal has not challenged the juvenile court's order denying his section 388 petition for a change in Minor's placement. That issue is therefore forfeited. (See *P.L., supra*, 100 Cal.App.5th at p. 409, fn. 4; *Daniel M., supra*, 110 Cal.App.4th at p. 707, fn. 4.)

[11] As to Mother, the court found she maintained regular visitation and contact with Minor but the child did not have a "substantial positive emotional attachment" to her and would not suffer detriment if her parental rights were terminated.

adoptable, the burden then shifts to the parent to demonstrate that a statutory exception applies. (*Id.* at p. 1225; § 366.26, subd. (c)(1).) If the parent does not establish an applicable statutory exception, the juvenile court must terminate parental rights. (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 316.)

One such statutory exception is the parental-benefit exception. (§ 366.26, subd. (c)(1)(B)(i).) It applies if "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Ibid.*) This exception requires the parent to prove three elements: "1) regular visitation and contact, taking into account the extent of visitation permitted; (2) a substantial, positive, emotional attachment to the parent— the kind of attachment implying that the child would benefit from continuing the relationship; and 3) a showing that terminating the attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*In re M.G.* (2022) 80 Cal.App.5th 836, 847, citing *Caden C., supra*, 11 Cal.5th at pp. 636–637.)

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' [Citation.] Visits and contact 'continue[ ] or develop[ ] a significant, positive, emotional attachment from child to parent.' [Citation.] Courts should consider in that light whether parents 'maintained regular visitation and contact with the child' (§ 366.26, subd. (c)(1)(B)(i)) but certainly not to punish parents or reward them for good behavior in visiting or maintaining contact—here, as throughout, the focus is

on the best interests of the child.  [Citation.]" (*Caden C., supra*, 11 Cal.5th at p. 632.)

## B.  *Standard of Review*

Father contends there is insufficient evidence in the record to support the juvenile court's finding that he did not maintain regular visitation and contact with Minor for purposes of the parental-benefit exception to adoption. But "[i]n the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment.  This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528 (*I.W.*).)  "Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence *compels* a finding in favor of the appellant as a matter of law.  [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*Id.* at p. 1528, italics added; accord, *Estes v. Eaton Corp.* (2020) 51 Cal.App.5th 636, 651 [" 'where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence *compels a finding in favor of the appellant as a matter of law*' "].)

## C.  *Analysis*

In ruling the parental-benefit exception did not apply to Father, the juvenile court found he did not maintain regular visitation and contact with

Minor, as required under *Caden C.* (See *Caden C., supra*, 11 Cal.5th at p. 632.) The court instead determined that he visited Minor only "sporadically" throughout the dependency; that a "caring parent would know that their child had been removed and was in foster care"; and that he "only began to see [Minor] consistently" after the selection/implementation hearing had been scheduled. The court therefore declined to analyze the remaining elements of the exception as set forth in *Caden C.* (See *id.* at pp. 632–633.)

In assessing Father's contacts with Minor during dependency, it appears the juvenile court applied a "knew or should have known" legal standard in determining whether he chose to voluntarily absent himself from the proceedings. We independently conclude this was the proper standard, and that Father failed to make any contrary showing. Indeed, the record fully supports the conclusion that Father knew or should have known of the dependency, and that he simply chose not to participate. (See *In re A.P.* (2024) 103 Cal.App.5th 1137, 1143 ["Whether a trial court applied the correct legal standard in exercising its discretion is a question of law that we review de novo."].)

Father admitted he knew of the dependency in about April 2023, about four months before he made his first appearance in the case and about six months before he started visiting Minor once a week for an hour. This evidence alone supports the juvenile court's finding he did not maintain "regular visitation and contact" with Minor during the dependency proceedings. (See § 366.26, subd. (c)(1)(B)(i); *Caden C., supra*, 11 Cal.5th at p. 632.) In addition, after Mother's DUI arrest in May 2022 and Minor's removal from her care, the Agency attempted to contact Father on multiple occasions. Father, however, never responded to the Agency, despite the fact he (1) was still seeing Mother, who was having supervised visits with Minor;

14

(2) himself visited Minor in January 2023, five months into the dependency; and (3) claimed also to have informally visited Minor about five other times during reunification.

Father also mistakenly believed that maternal grandmother—and not Mother—had "custody" of the child during the proceedings. He acknowledged he "[s]ort of" knew about the dependency, but believed his involvement was unnecessary because he was "comfortable" with the informal "coparenting arrangement" he and Mother allegedly utilized. Father thus "didn't feel [he] needed to come to family court and get anything." Even accepting this is what he subjectively believed, the disconnect between this belief and reality indicates that Father did not engage in "regular visitation and contact" with Minor. (See § 366.26, subd. (c)(1)(B)(i); *Caden C., supra*, 11 Cal.5th at p. 632.)

The record also shows that when Mother disclosed in March 2023 that Father was Minor's biological parent, Mother's counsel informed the juvenile court that Mother had withheld this information because Father had threatened to retaliate against her if she involved him in this case. Mother's concern was reasonable given that she accused Father of multiple acts of domestic violence—including physical abuse—while pregnant with Minor, as set forth in a court filing she made under penalty of perjury in June 2021.[12] This evidence further supports the inference that Father made a conscious decision not to involve himself in Minor's dependency until it appeared the child might be "adopted out."

---

[12] Father himself introduced Mother's request for a domestic violence restraining order against him when he unsuccessfully attempted to show that the Agency allegedly did not act with the requisite diligence in attempting to locate him.

In sum, we conclude the record does not compel a finding (see *I.W., supra*, 180 Cal.App.4th at p. 1528) that Father maintained "regular visitation and contact" with Minor for purposes of the parental-benefit exception to adoption.  (See § 366.26, subd. (c)(1)(B)(i); *Caden C., supra*, 11 Cal.5th at p. 632.)

## DISPOSITION

The juvenile court's order terminating the parental rights of Father is affirmed.  In light of our decision with regard to Father, we also affirm the court's order terminating Mother's parental rights.

DATO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

IRION, J.

16